IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 6, 2024

## STATE OF TENNESSEE v. TRAVIS RUZICKA

**Appeal from the Criminal Court for Shelby County**
**No. 19-06553    Paula Skahan and Chris Craft, Judges**

_____

### No. W2023-00134-CCA-R3-CD

_____

A Shelby County jury convicted the Defendant, Travis Ruzicka, of rape of a child and aggravated sexual battery. He appeals, contending that (1) the forensic interview did not meet the admissibility requirements of Tennessee Code Annotated section 24-7-123; (2) the trial court erred by admitting the forensic interview of the victim after the victim had testified, thus depriving the Defendant of the opportunity to contemporaneously cross-examine the victim as to the contents of the interview recording; and (3) the victim was incompetent to testify at trial and thus unavailable for cross-examination. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

Claiborne H. Ferguson (on appeal), and Joseph S. Ozment (at trial), Memphis, Tennessee, for the appellant, Travis Ruzicka.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Lessie Rainey and Regina Lucreziano, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.    FACTUAL AND PROCEDURAL HISTORY

On July 22, 2019, the seven-year-old victim disclosed to her mother that her babysitter, the Defendant, had sexually abused her earlier that day. Following an

investigation, which included a forensic interview of the victim at the Memphis Child Advocacy Center ("MCAC"), a Shelby County grand jury indicted the Defendant and charged him with rape of a child and aggravated sexual battery. *See* Tenn. Code Ann. §§ 39-13-504(a)(4), -522(a).

### A. Pretrial Hearing on the Admissibility of the Forensic Interview

Prior to trial, the State filed a motion for a pretrial hearing to admit the forensic interview of the victim pursuant to Tennessee Code Annotated section 24-7-123. The Defendant responded with a motion to exclude the same, arguing that section 24-7-123 is facially unconstitutional and that multiple provisions of the Tennessee Rules of Evidence require exclusion of the forensic interview. A pretrial hearing ensued on April 29, 2022.[1]

The victim was nine years old and in third grade at the time of the pretrial hearing. She explained that she knew the difference between the truth and a lie: "Well, a lie is something where you're not telling the real thing and the truth is when you're telling the real thing." She promised that she would tell the truth at the hearing. The victim testified that she had watched a video in the prosecutor's office earlier that morning, and the video depicted her "talking about something." She testified that she had watched the entire video. The victim identified a compact disc that contained the video, on which she had previously written her name and drawn a flower. She agreed that the video depicted a conversation between her and "Ms. Pat." The victim agreed that if she came to court to answer questions about the "same stuff," she would do her best to answer those questions honestly.

Following the victim's direct examination, the pretrial hearing court asked defense counsel, "Do you have any questions about that limited discussion?" Defense counsel asked, "Is Your Honor not going to allow me to ask questions about what is on the video itself?" The pretrial hearing court responded, "Not today." Defense counsel argued that he should be able to cross-examine the victim on her statements during the forensic interview to enable the pretrial hearing court to determine whether her statements possessed particularized guarantees of trustworthiness, as required by the statute. After further discussion, the pretrial hearing court stated, "I understand[,] and you're going to be able to cross-examine the person who did the interviewing, but at this time you don't have the opportunity to cross-examine the nine-year-old."

---

[1] Judge Paula Skahan presided over the pretrial hearing. The case was later transferred to Judge Chris Craft, who presided over the trial, the sentencing hearing, and the motion for new trial hearing. We will refer to Judge Skahan as the pretrial hearing court and to Judge Craft as the trial court.

The hearing recessed until May 6, 2022, at which time Lydia Crivens, Director of Interagency Partnerships at the MCAC, testified regarding the agency's policies and procedures as they related to the applicable statutory requirements. *See* Tenn. Code Ann. §§ 9-4-213 (setting forth the requirements for child advocacy centers to receive state appropriations), 24-7-123(b)(3)(A) (generally requiring a forensic interviewer to be employed by a child advocacy center that meets the requirements of section 9-4-213). Specifically, Ms. Crivens testified that the MCAC is a nonprofit corporation that has received a determination of exemption from the Internal Revenue Service; the MCAC employs an executive director answerable to a board of directors and who is not a salaried employee of any governmental entity that has signed the MCAC's memorandum of understanding and working protocol; the MCAC has a signed memorandum of understanding and working protocol executed among the Department of Children's Services, the District Attorney General's Office, all county and municipal law enforcement agencies within the applicable geographic region, and any other government entity which participates in child abuse investigations; the MCAC facilitates the use of a multidisciplinary team which jointly assesses victims of child abuse and their families and determines the need for services; the MCAC provides a child-focused, neutral, comfortable, private, and safe facility where the multidisciplinary team can meet to coordinate the efficient and appropriate disposition of child abuse cases through the civil and criminal justice systems; the MCAC provides necessary services, referrals to such services, and case tracking; the MCAC has written policies and procedures consistent with the standards established by the National Network of Children's Advocacy Centers; and the MCAC accurately collects and reports the outcome data and information relative to its operation to the Tennessee Chapter of the Children's Advocacy Centers. Ms. Crivens testified that the MCAC complied with these standards as of July 2019, the time of the victim's forensic interview.

Patricia Lewis, supervisor of forensic interviewers at the MCAC, testified that she conducted the victim's forensic interview on July 29, 2019. Ms. Lewis explained that she held a bachelor's degree in social work from the University of Memphis; she had conducted forensic interviews of children for twenty-one years; she had completed forty hours of forensic training in interviewing traumatized children, followed by fifteen hours of annual continuing education; she had completed eight hours interviewing under the supervision of a qualified forensic interviewer; she had trained under the CornerHouse protocol pertaining to age-appropriate questions for children and child development; she did not have a criminal history; and, she had actively participated in peer review. *See* Tenn. Code Ann. § 24-7-123(b)(3) (setting forth the qualifications for forensic interviewers).

A recording of Ms. Lewis' interview with the victim was played in court, and it revealed that the victim told Ms. Lewis that she was seven years old and about to enter first grade. She provided the names of her parents and indicated that her father fixed cars and trucks. The victim told Ms. Lewis "that boy" had kissed her on her lips while he was babysitting her and her brother. The victim could not remember the boy's name, but she knew that he lived with his mother, his older sister, and his younger brother. The victim provided the first names of the boy's siblings. The victim explained that the boy and his family had previously lived in the victim's house because they did not have a home at the time. The victim said that the boy was babysitting her because her father was at work and her mother was at the hospital.

The victim stated that when the boy kissed her, he rolled his tongue around, "like big people do," but that she kept her lips closed. The victim said the boy touched her "hoo-ha" with his fingers, both outside and inside of her underwear, while they were in the living room. She stated that this hurt. She also stated the boy placed his "wee-wee" inside her "butt" and "hoo-ha." The victim said that the boy made her lie on a pile of dirty clothes in the bathroom while these acts occurred. She stated the boy covered her mouth during one of these incidents because she was about to scream. She also explained that the boy placed his tongue on her "hoo-ha" and that he placed his "wee-wee" inside of her mouth. She stated that she washed her mouth out in the bathroom sink afterward.

On cross-examination, Ms. Lewis explained that her interview of the victim was "semi-blind," in that Ms. Lewis had learned some of the underlying allegations from law enforcement prior to the interview. Ms. Lewis could not recall the actual dates of her recent annual trainings, but she indicated that these trainings would be reflected in her curriculum vitae, which she had not brought to court.

At the conclusion of the proof, the pretrial hearing court ruled as follows:

Yeah, I do find that it is trustworthy and reliable and all that. I don't find any problem with the interview. There was no suggestive languages [sic] by Supervisor Lewis so it will be admissible at the trial if the State wishes to present it.

The pretrial hearing court asked the prosecutor to submit a proposed written order, but no such order appears in the record on appeal.

## B. Trial Proceedings

The Defendant's trial commenced on June 21, 2022. The victim's mother testified that she lived in Memphis with her long-time boyfriend D.C.,[2] the victim, and the victim's twin brother. On July 21, 2019, the victim's mother invited the Defendant to spend the night so that he could babysit the children the next day, when the victim's mother had a doctor's appointment and D.C. was scheduled to work. The victim's mother knew the Defendant through his mother. The Defendant's mother, her daughter, and her small son had previously lived with the victim's family for a time during a housing transition. The Defendant would visit his mother at the victim's home during this time.

On the afternoon of July 22, 2019, the victim's mother returned home from her doctor's appointment and relieved the Defendant. D.C., who had returned home from work, took the Defendant home to get his dog, as they had agreed that the Defendant would babysit the children for a few more days. As soon as the Defendant left with D.C., the victim, seven years old at the time, told her mother that the Defendant was "touching and kissing me." When her mother asked the victim where the Defendant had touched her, she pointed to "her private spots." The victim's mother called D.C. and instructed him to return home with the Defendant.

D.C. returned to the house with the Defendant, and the victim told D.C. what she had told her mother. The victim's mother said that she and D.C. confronted the Defendant but that he denied the accusation. According to the victim's mother, the Defendant stated that he had only taken the victim to the bathroom to look "at her private because she said it hurt." When the victim's mother told D.C. that she was going to take the victim to Le Bonheur Children's Hospital, she recalled the Defendant's saying, "[M]aybe I need to go to jail."

On the way to Le Bonheur, the victim disclosed to her mother that the Defendant "had stuck his private in her mouth[,]" as well as "in her private and in her booty." After the victim's initial examination at Le Bonheur, the doctor informed her mother of the presence of trauma. Officers with the Memphis Police Department ("MPD") and representatives of the Department of Children's Services arrived on scene at the request of hospital staff. An MPD officer then escorted the victim and her mother to the Memphis Rape Crisis Center for further examination. The victim was later forensically interviewed, and she underwent six to seven months of therapy following this incident.

---

[2] We use initials to protect the victim's anonymity.

D.C. testified that he was driving the Defendant home to get his dog when the victim's mother called and stated that they needed to ask the Defendant some questions. When D.C. and the Defendant returned, the victim's mother informed them of the accusation. D.C. said that the victim told him "that boy touched me" but did not offer details. D.C. stated that the Defendant denied the accusation. According to D.C., the Defendant said, "I never touched her. She said her hoo-ha was hurting and I took her in the bathroom and looked but I never touched her." This confused D.C., who asked the Defendant why he would look at the victim's "hoo-ha." The Defendant did not respond. D.C. then heard the Defendant mumble, "[M]aybe I should just go to jail." D.C. asked the Defendant what he meant by that, to which the Defendant responded, "[N]othing." Later, D.C. asked the victim's brother where he was on that day, and the brother responded that the babysitter told him to stay in his room and play.

Following the testimony of an MPD officer regarding the collection of the victim's rape kit and clothes, the State called the victim as a witness. The appellate record does not contain a transcript of the administration of the oath to the victim but instead reflects that she testified after being "called as a witness and having been duly sworn[.]" The record reflects that the victim often responded to questioning with either one-word answers or non-verbal gestures such as nods or shoulder shrugs, and at times, she covered her face with a stuffed zebra that she had brought to the witness stand.

Nevertheless, the victim stated and spelled her name, provided her birthday, testified that she was ten years old, and provided the name of her elementary school. She indicated that she was about to start fourth grade and that her favorite class was math. The victim said that she liked making friends, but she did not know if any of her friends from last year would be in her class in the upcoming year. The victim provided the first names of her mother and D.C., as well as the name of her twin brother. She indicated that she also had other brothers and sisters and that she was older than her twin brother because she was born first. She testified that she lived with her parents, her twin brother, and her grandmother. She conveyed that her family had two big dogs but that her grandmother's smaller dog also lived with them. When asked if she got along with her twin brother, she responded, "Not a lot." She described her and her brother's various hobbies and interests. She then testified that they lived in a different house than when she was seven years old and that she thought she and her brother had separate rooms in the old house.

When asked by the prosecutor on multiple occasions if she remembered "something happening" with her babysitter, the victim responded, "Yes." The victim could not recall the babysitter's name. Initially, the victim could not identify the babysitter among the

people in the courtroom. After the trial court asked everyone in the courtroom to remove their facial masks, the victim stated, "I don't know 'cause I'm not sure."[3]

When asked who was at her house when "something happened," the victim responded that her brother was home. When asked if the babysitter was there, the victim responded affirmatively by nodding her head up and down. The prosecutor then asked, "Can you tell me what you remember happening with the babysitter?", to which the victim responded negatively by shaking her head from left to right. After a brief bench conference and after the victim's request for tissue and water, the prosecutor asked the victim if she remembered being in the living room with the babysitter, to which she replied, "I think yes." When asked if she remembered what happened in the living room, the victim replied, "Yes." When asked if anyone else was in the living room with her and the babysitter, the victim answered, "No." When asked again if she could explain what happened with the babysitter, the victim shook her head and then stated, "No." The victim could not remember anything that the babysitter said, but she repeated that she remembered what the babysitter did. When asked if the babysitter did something to himself or to her, the victim responded, "To me." The victim responded negatively when asked if it was something she was "okay with[.]" The victim could not remember if the "thing that he did" hurt her.

The victim responded affirmatively when asked if the babysitter touched her body with his hand. When asked what part of her body he touched, the victim responded, "My mouth." When asked to demonstrate what the babysitter did to her mouth, the victim covered her mouth with her left hand. The victim stated that something happened with the babysitter in a room other than the living room, but she would not identify that room when asked.

The victim remembered that in 2019, her mother took her "to the building with teddy bears" and that she was given a couple of teddy bears to take home after the visit. She remembered speaking with a female at the building but could not remember the female's name. She testified that she remembered watching a video recording from that building but did not remember "doing what's in the video."

At this point, the prosecutor attempted to use a doll as a demonstrative aid during the victim's direct examination. When asked if "anything else happened with the babysitter's body?", the victim responded affirmatively, but she would not point to the doll to identify what part of the babysitter's body to which she was referring. When the victim was asked if she remembered "what happened with the babysitter's body?", she responded

---

[3] Both the victim's mother and D.C. identified the Defendant as being the children's babysitter.

affirmatively, but when asked, "Do you want to tell me what happened with the babysitter's body?", she responded negatively.

The prosecutor then concluded her direct examination. When recognized for cross-examination, defense counsel stated, "Your Honor, I have no questions."

Amanda Taylor, an expert in sexual assault nurse examinations, testified that she examined the victim at the Memphis Rape Crisis Center at 2:00 a.m. on the morning of July 23, 2019. Ms. Taylor's report from the examination was entered as an exhibit and indicated that the victim was experiencing vulvar discomfort and pain during urination. Ms. Taylor's report contained the following "History of Assault":

> ALONE WITH NURSE, [THE VICTIM] STATED SHE WAS HERE BECAUSE, "HE WAS DOING THIS WITH HIS FINGERS IN ME [SHE DEMONSTRATED A RUBBING MOTION WITH HER HANDS IN HER GENITAL AREA, DIGITAL/VAGINAL PENETRATION]. HE PUT HIS PRIVATE PART, THERE [PENILE/VAGINAL PENETRATION NO CONDOM AND UNKNOWN EJACULATION]. IT WAS SO HARD, IT HURT. HE SAID, 'IF I KEEP DOING THIS IT WILL GET BETTER,' BUT IT NEVER DID. HE TOLD ME TO PUT MY MOUTH ON HIS WEE WEE, BUT IF I DIDN'T LIKE THE TASTE, I COULD STOP" [PENILE/ORAL PENETRATION – NO CONDOM AND UNKNOWN EJACULATION]. WHILE ON EXAM TABLE [THE VICTIM] STATED, "HE PUT HIS WEE WEE IN MY BUTT TOO" [PENILE/ANAL PENETRATION NO CONDOM AND UNKNOWN EJACULATION]. SHE REPORTED THAT TRAVIS TOOK HER SKIRT AND PANTIES OFF OF HER.

(Victim's name altered; remaining bracketed portions in original.) Ms. Taylor explained that the quoted portions of her report were the victim's exact words, while the bracketed portions contained Ms. Taylor's clarifications, based upon the victim's verbal and non-verbal descriptions. Ms. Taylor explained that these clarifications are necessary because minor patients will often point to parts of their bodies and not use adult terminology.

Ms. Taylor noted that the victim "had a white thick substance and debris" around her clitoral hood. Ms. Taylor described the following injuries to the victim's vaginal and anal areas:

- 8 -

[S]he had a laceration above the clitoral hood. I did not see any bleeding. She had another laceration to the left labia minora. A laceration to the fossa navicularis. A linear laceration midlong along the perineum and posterior fourchette that extended all the way to the perineal – or the perianal area and she had multiple perianal lacerations at four, five[,] and seven o'clock.

Ms. Taylor took pictures of the victim's injuries, which were entered as exhibits. Ms. Taylor attributed the victim's injuries to blunt force trauma. Ms. Taylor noted that the injuries were consistent with the account provided by the victim but that she could not rule out other causes. Ms. Taylor could not date the injuries but noted that "they were more acute because there [were] not any healing processes"; she added that these injuries would have healed quickly, but they had not started the healing process. Ms. Taylor collected swabs from the victim's body to include in the rape kit and to allow for DNA testing.

Special Agent Forensic Scientist Jordan Ragon with the Tennessee Bureau of Investigation testified that he tested the victim's rape kit for the presence of DNA by comparing samples with known DNA standards from the victim and the Defendant. Initial testing was inconclusive, other than demonstrating that neither semen nor saliva were detected on the rape kit swabs. Special Agent Ragon then conducted Y-STR testing, which is a more specialized DNA test that allows isolation of the Y chromosome, found only in male DNA. Following this testing, Special Agent Ragon determined that male DNA was present on the swabs taken from the victim's vulvar and perianal areas, but there was not enough DNA to obtain a more definitive identification. As he had already excluded the presence of semen and saliva, Special Agent Ragon opined that this DNA was likely attributable to male skin cells. Special Agent Ragon testified that it would be possible to transfer DNA to this area by helping a child put on underwear but that it was unlikely because skin cells contain a limited amount of DNA, and such cells would be less likely to transfer an adequate amount of DNA to a secondary surface for testing purposes.

Prior to the State's calling Patricia Lewis as a witness at trial, the Defendant renewed his objection to the admission of the forensic interview. The Defendant argued that the statute should be read as requiring the victim to be available for cross-examination "during the playing of the video[.]" The Defendant conceded that he had not attempted to cross-examine the victim on the previous day but argued that she "was pretty much unable to answer any questions[.]" The trial court countered, "She did answer a lot of questions." The Defendant persisted that, to have effective cross-examination, the forensic interview had to be admitted through the victim or at least before the victim testified. But the trial court responded that the Defendant could have cross-examined the victim the previous day. Ultimately, the trial court ruled that the victim had been made available for

cross-examination for the purposes of Tennessee Code Annotated section 24-7-123 and overruled the Defendant's objection.

Patricia Lewis testified regarding her forensic interview of the victim on July 29, 2019. She stated that they have "[l]ots of teddy bears" at the MCAC. A recording of the forensic interview, as described *supra*, was entered as an exhibit and played for the jury.

The State rested and made the following election of offenses: as to count 1 charging rape of a child, the alleged act described by the victim in her forensic interview, occurring in the bathroom when the Defendant told her to lie down on dirty clothes and put his "wee wee" inside her "butt"; and as to count 2 charging aggravated sexual battery, the alleged act described by the victim in her forensic interview, occurring in the living room when the Defendant "touched her 'hoo-ha' with his fingers on top and inside and it hurt." Following an unsuccessful motion for judgment of acquittal, the Defendant elected to testify.

The Defendant testified that he babysat the victim and her brother while their parents were gone on the day in question, but he denied the victim's accusations. On cross-examination, the Defendant agreed that he had previously stayed at the victim's house with his mother and siblings. Describing the time in the victim's house when he was confronted with her allegations, the Defendant testified that he told the family that the accusations were serious and could cause him to go to jail for a long time. He contended it was he who suggested the victim should be taken to Le Bonheur. The Defendant denied telling the victim's parents that he went into the bathroom with her after she complained of vaginal pain. He testified that he had told the victim to go into the bathroom alone after she had come into the living room crying and saying that it hurt "down there." The Defendant maintained that he did not enter the bathroom with the victim but that she told him through the closed door that it "burns." The Defendant testified that he provided this account to D.C. on the drive to the Defendant's house before the victim's mother called D.C.

The jury convicted the Defendant of rape of a child and aggravated sexual battery, and the trial court later imposed an effective sentence of twenty-five years. The Defendant filed a timely motion for new trial, which he later amended. In his amended motion for new trial, the Defendant alleged, *inter alia*, that the trial court erred by not requiring the State to admit the forensic interview through the testimony of the victim and instead by allowing admission through Ms. Lewis' subsequent testimony. This, the Defendant argued, prevented him from cross-examining the victim concerning out-of-court statements she made in the recording.

- 10 -

The trial court denied the Defendant's motion for new trial following a hearing and after giving detailed reasoning as to every ground alleged by the Defendant in his motion. Concerning the allegations related to the timing of the forensic interview's admission, the trial court noted that the statute does not require the State to admit the forensic interview through the victim's testimony or "in any particular order of proof." The trial court found that the victim was available for cross-examination concerning the forensic interview while she was on the witness stand. The trial court noted that Tennessee Rule of Evidence 613 allowed for cross-examination in such circumstances. The trial court added that it would have allowed such cross-examination had the Defendant attempted it. The trial court stated, "I also generally find that forensic [interview] video admissible." It continued, "I have nothing before me to indicate that anything was untoward about it or that it did not comply with the statute, even though that was not my call before I took the trial transfer."

The Defendant timely appealed.

## II.   ANALYSIS

### A.   The Admission of the Forensic Interview

The Defendant argues that the forensic interview did not meet the admissibility requirements of Tennessee Code Annotated section 24-7-123. Specifically, the Defendant contends that (1) the victim did not properly authenticate the recording at trial and (2) the pretrial hearing court failed to make specific findings on the record sufficient to uphold its ruling of admissibility. The State contends that the Defendant has waived these arguments for failing to raise them in his motion for new trial.

#### 1.   Waiver

Our supreme court has recently reemphasized that "an appellate court's authority 'generally will extend only to those issues presented for review.'" *State v. Bristol*, 654 S.W.3d 917, 923 (Tenn. 2022) (quoting Tenn. R. App. P. 13(b)); *see also Hodge v. Craig*, 382 S.W.3d 325, 334-35 (Tenn. 2012). This "principle of party presentation" is a defining feature of our adversarial justice system. *Bristol*, 654 S.W.3d at 923 (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375, (2020)). "It rests on the premise that the parties 'know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *Id*. at 923-24 (quoting *Sineneng-Smith*, 590 U.S. at 375-76). "In our adversarial system, the judicial role is not to research or construct a litigant's case or arguments for him or her, but rather to serve as arbiters of legal questions presented and argued by the parties before them[.]" *Id.* at 924 (internal quotations and citations omitted).

- 11 -

Accordingly, an appellate court "may decline to consider issues that a party failed to raise properly." *Id.* at 923 (quoting *State v. Harbison*, 539 S.W.3d 149, 165 (Tenn. 2018)).

Moreover, "an appellate court's jurisdiction is 'appellate only.'" *Id*. at 925 (quoting Tenn. Const. art. VI, § 2). "It extends to those issues that 'ha[ve] been formulated and passed upon in some inferior tribunal.'" *Id.* (quoting *Fine v. Lawless*, 205 S.W. 124, 124 (Tenn. 1918)). "Like the party-presentation principle, preservation requirements further values fundamental to our justice system." *Id.* They "ensure that the defense and the prosecution are afforded an opportunity to develop fully their opposing positions on an issue, and such requirements also enable a trial court to avoid or rectify an error before a judgment becomes final." *State v. Minor*, 546 S.W.3d 59, 65 (Tenn. 2018) (citing *Puckett v. United States*, 556 U.S. 129, 135 (2009); *State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010)). "[P]reservation requirements serve to promote fairness, justice, and judicial economy by fostering the expeditious avoidance or correction of errors before their full impact is realized, and in this way, may obviate altogether the need for appellate review." *Id*. (citations omitted).

Tennessee Rule of Appellate Procedure 3(e) provides that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Rule 3(e), thus, provides that issues presented in the motion for new trial must be "specified with reasonable certainty so as to enable appellate courts to ascertain whether the issue was first presented for correction in the trial court." *Waters v. Coker*, 229 S.W.3d 682, 689 (Tenn. 2007). The Tennessee Supreme Court has explained,

> Before an issue can be properly preserved in a motion for a new trial under Rule 3(e), a well-pleaded motion should (1) allege a sufficient factual basis for the error by setting forth the specific circumstances giving rise to the alleged error; and (2) allege a sufficient legal basis for the error by identifying the trial court's claimed legal basis for its actions and some articulation of why the court erred in taking such actions.

*Fahey v. Eldridge*, 46 S.W.3d 138, 146 (Tenn. 2001). The motion for new trial ensures that a trial judge "might be given an opportunity to consider or to reconsider alleged errors committed during the course of the trial or other matters affecting the jury or the verdict." *Id.* at 142 (quoting *McCormic v. Smith*, 659 S.W.2d 804, 806 (Tenn. 1983)). Importantly, "a defendant may not object to the introduction of evidence on one ground, abandon this ground, and assert a new basis or ground for the objection in this Court." *State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988). Stated another way, a party is bound by

- 12 -

the evidentiary theory argued to the trial court and may not change or add theories on appeal. *See State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001).

In his amended motion for new trial, the Defendant provided three grounds supporting his contention that the forensic interview should have been excluded at trial. On appeal, the Defendant abandons these grounds and asserts two novel grounds for exclusion: (1) the victim did not properly authenticate the forensic interview at trial and (2) the pretrial hearing court failed to make specific findings on the record sufficient to uphold its ruling of admissibility. As stated, the law requires a defendant to state in his motion for new trial "the specific circumstances giving rise to the alleged error[.]" *Fahey*, 46 S.W.3d at 146. This requirement is not academic but instead strikes at the jurisdiction of this court to hear only "those issues that 'ha[ve] been formulated and passed upon in some inferior tribunal.'" *See Bristol*, 654 S.W.3d at 925 (quoting *Fine*, 205 S.W. at 124). In this case, the Defendant seeks relief on two theories of exclusion that were never formulated to or passed upon by the trial court. Had the Defendant presented these theories to the trial court via a motion for new trial, it is probable that the trial court would have provided detailed rulings on those specific grounds—as it did with the grounds listed in the motion for new trial—and thus allowed this court to properly exercise its appellate jurisdiction to consider the propriety of those rulings. As it stands, however, the Defendant failed to give the trial court the opportunity either to correct the potential errors of which he now complains or to explain why relief was not warranted. The issues are waived.

## 2. Plain Error Review

The aforementioned "limits on an appellate court's authority are important, but they are not 'ironclad.'" *Bristol*, 654 S.W.3d at 926 (quoting *Sineneng-Smith*, 590 U.S. at 376). Tennessee Rule of Appellate Procedure 13(b), for instance, provides that an appellate court "may in its discretion consider other issues in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process." Rule 36(a) provides that appellate courts "shall grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires." Tenn. R. App. P. 36(a). Additionally, the appellate rules have codified the common-law plain error doctrine, which allows an appellate court to "consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b).

In this case, the Defendant did not acknowledge in his principal brief that he had waived the issues he now presents for appellate review by failing to include the same in his motion for new trial. Despite the State's waiver argument in its principal brief, the

Defendant did not file a reply brief either to rebut the waiver argument or to ask for plain error relief. Ordinarily, this would foreclose our sua sponte consideration of plain error relief. *See State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) (citations omitted). However, we have exercised our discretion in this case to order further briefing on whether the Defendant is entitled to plain error relief for the waived issues. *See* Tenn. R. App. P. 13(b); *see also Bristol*, 654 S.W.3d at 927 ("[W]hen an appellate court considers an issue that has not been properly presented, it must give the parties 'fair notice and an opportunity to be heard on the dispositive issues.'") (quoting *Harbison*, 539 S.W.3d at 165). To that end, the parties have filed supplemental briefs addressing the following question: If the court concludes that the Defendant has waived plenary review regarding the two theories of exclusion listed in his principal brief, is the Defendant entitled to plain error under these theories? *See Bristol*, 654 S.W.3d at 927 ("[S]upplemental briefing ordinarily will be 'the best way to test a notion of the court's own invention.'") (quoting *State v. Johnson*, 416 P.3d 443, 456 (Utah 2017)). The issue of plain error relief as to these two theories is now properly before us for consideration.

In conducting plain error review, our court will reverse for plain error only if the five following prerequisites are satisfied:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be present in the record before an appellate court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. *Id*. at 283. To warrant plain error relief, the magnitude of the error must have been so significant "that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)). Plain error relief should be "sparingly exercised[,]" *see State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), and is only appropriate for errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding," *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). A defendant has the burden of persuading the appellate court that plain error exists. *Bledsoe*, 226 S.W.3d at 355.

a.      The Authentication of the Forensic Interview Recording at Trial

In his principal brief, the Defendant argues that the victim "did not properly authenticate the forensic interview at trial."  In support of this contention, the Defendant cites the victim's inability or unwillingness to testify either to the forensic interview or to the details of her abuse.  In his supplemental brief, the Defendant attempts to frame the issue as one of confrontation rather than authentication, arguing that his Sixth Amendment rights were violated because he had neither the ability nor the opportunity to cross-examine the victim at trial, given her obvious reluctance while testifying.  The State responds that the Defendant cannot show a breach of a clear and unequivocal rule of law because the victim properly authenticated the forensic interview recording at the pretrial hearing and was therefore not required to reauthenticate the evidence at trial.  The State also contends that the admission of the recording did not affect a substantial right of the Defendant and that consideration of the issue is not necessary to do substantial justice.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims."  Tenn. R. Evid. 901(a).  Authentication may be established by the testimony of a witness with knowledge "that a matter is what it is claimed to be."  Tenn. R. Evid. 901(b)(1).  Both Rule 901 and the common law designate the trial court as the "arbiter of authentication issues[.]"  Tenn. R. Evid. 901, Advisory Comm'n Cmts.

Regarding the authentication and admissibility of a recorded forensic interview, the Code provides, *inter alia*, that such a recording may be admitted if "[t]he child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination[.]"  Tenn. Code Ann. § 24-7-123(b)(1).  Our supreme court has held that the proper construction of section -123(b)(1) allows for admission of a forensic interview "when the witness first authenticates the video recording and then appears for cross-examination at trial to defend or explain the prior recorded statements."  *State v. McCoy*, 459 S.W.3d 1, 15 (Tenn. 2014) (accepting the State's concession that the statute "requires the witness to authenticate the video recording *before* it is submitted, and to be available for cross-examination *at trial*" (emphases in original)).  Questions concerning the admissibility of a forensic interview rest within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record.  *State v. Franklin*, 585 S.W.3d 431, 448 (Tenn. Crim. App. 2019).

As an initial matter, we reject the Defendant's attempt in his supplemental brief to frame the issue presented as one of confrontation rather than authentication. In his principal brief, he clearly challenged the lack of authentication of the recording at trial, and it was this specific issue on which we requested further briefing.

Turning to the authentication issue, we conclude that the Defendant has not shown a breach of a clear and unequivocal rule of law related to the victim's authentication of the forensic interview recording. At the pretrial hearing, the victim testified under oath that she had watched the entire video recording, which depicted her "talking about something." She agreed that the recording depicted a conversation between her and "Ms. Pat." The victim had previously written her name and drawn a flower on the disc that contained the recording, and she specifically identified that disc in court. This evidence established "that the offered video recording is a true and correct recording of the events contained in the video recording." *See* Tenn. Code Ann. § 24-7-123(b)(1). Because the victim properly authenticated the forensic interview recording at the pretrial hearing, the State was not required to have her reauthenticate the recording at trial. *See McCoy*, 459 S.W.3d at 15.

b.     The Adequacy of the Pretrial Hearing Court's Findings of Fact

A court ruling on the admissibility of a video recording of a forensic interview of a child "shall make specific findings of fact, on the record, as to the basis for its ruling[.]" Tenn. Code Ann. § 24-7-123(d). The Defendant argues in his principal brief that the pretrial hearing court's failure to make adequate findings of fact on the record as required by statute warrants a reversal of his convictions. Despite the State's waiver argument in its principal brief, the Defendant did not file a reply brief asking for plain error relief. Nevertheless, and as previously stated, we requested supplemental briefing regarding whether the Defendant was entitled to plain error relief as to this issue. Other than restating the issue as raised in his principal brief, however, the Defendant made no other mention in his supplemental brief of the pretrial hearing court's failure in this regard, nor did he provide any argument as to why he is entitled to plain error relief in light of the pretrial hearing court's inadequate findings.

We reiterate that the Defendant bears the burden of persuading the appellate court that plain error exists. *See Bledsoe*, 226 S.W.3d at 355. Assuming that the pretrial hearing court's inadequate findings rise to the level of a breach of a clear and unequivocal rule of law, it remains the Defendant's responsibility to persuade us that the remaining prerequisites of plain error relief have been satisfied. While the Defendant generally addresses the five *Adkisson* factors in his supplemental brief, he does so in the context of the authentication issue; he makes no argument as to whether the plain error factors have

been met regarding the issue of the pretrial hearing court's findings. He is not entitled to plain error relief on this issue.

### B.     The Timing of the Admission of the Forensic Interview

The Defendant claims that the trial court "erred in permitting the State to introduce the forensic interview into evidence through the subsequent testimony of the interviewer rather than contemporaneously with [the victim's] in-court testimony[.]" This error, the Defendant argues, deprived him of his right to confront his accuser as guaranteed in the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. Further, the Defendant contends that this error represents an unconstitutional application of Tennessee Code Annotated section 24-7-123. The State counters that the victim was available for cross-examination at trial and that the as-applied constitutional challenge is waived because the Defendant is raising it for the first time on appeal.

We begin by noting that the Defendant has denominated his order-of-proof claim in two different ways. First, he claims that the order of proof in this case violated his confrontation rights under the Constitutions of the United States and Tennessee. Second, he purports to lodge an as-applied confrontation challenge to Code section 24-7-123 based upon the order of the State's proof. The State addresses the former on the merits but argues that the latter is waived due to the Defendant's failure to raise it in the trial court. We conclude that the dual descriptions utilized by the Defendant create a distinction without a difference. The Defendant's essential point under either avenue remains the same—i.e. that his confrontation rights were violated by the State's order of proof, an issue to which we will give plenary review.

Generally, questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and we will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). More specifically, trial courts are vested with wide discretion in issues concerning the order of proof. *See Oliver v. State*, 348 S.W.2d 325, 327 (Tenn. 1961); *Conboy v. State*, 455 S.W.2d 605, 608 (Tenn. Crim. App. 1970). Issues of statutory and constitutional interpretation, on the other hand, are questions of law, which this court reviews de novo without any presumption of correctness given to the legal conclusions of the courts below. *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009) (citing *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008)). Accordingly, the question of whether the admission of certain evidence violates a defendant's right of confrontation is a question of law that we review de novo. *State v. Lewis*, 235 S.W.3d 136, 141-42 (Tenn. 2007).

At issue here is the admission of the victim's forensic interview pursuant to Tennessee Code Annotated section 24-7-123(a) which, at the time of the Defendant's trial, provided,

> [A] video recording of an interview of a child by a forensic interviewer containing a statement made by the child under thirteen (13) years of age describing any act of sexual contact performed with or on the child by another is admissible and may be considered for its bearing on any matter to which it is relevant in evidence at the trial of the person for any offense arising from the sexual contact if the requirements of this section are met.

Tenn. Code Ann. § 24-7-123(a) (2017 Repl.). Such a video recording "may" be admitted at trial if a number of statutory requirements are satisfied, including that "[t]he child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording *and the child is available for cross examination*[.]" *Id*. § -123(b)(1) (emphasis added).

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" The right of confrontation is fundamental and applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965); *State v. Henderson*, 554 S.W.2d 117, 119 (Tenn. 1977). The Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face[.]" Tenn. Const. art. I, § 9. The right of confrontation affords "two types of protection for criminal defendants: the right to physically face the witnesses who testify against the defendant, and the right to cross-examine witnesses." *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

"[T]he threshold question in every case where the Confrontation Clause is relied upon as a bar to the admission of an out-of-court statement is whether the challenged statement is testimonial." *State v. Dotson*, 450 S.W.3d 1, 63 (Tenn. 2014) (citing *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008)); *see also Crawford v. Washington*, 541 U.S. 36, 51-52 (2004). When an out-of-court statement is testimonial, "the party seeking to admit the statement must either (1) present the declarant as a witness who will testify and submit to cross-examination or (2) show that the witness is 'unavailable to testify, and

[that] the defendant had . . . a prior opportunity for cross-examination.'" *McCoy*, 459 S.W.3d at 14 (quoting *Crawford*, 541 U.S. at 53-55). A forensic interview qualifies as a testimonial statement. *Id.* at 15.

Nevertheless, the admission of forensic interviews "does not violate a defendant's right of confrontation so long as the child witness authenticates the video recording and appears for cross-examination at trial, as required by our statute." *Id*. at 16. As the *McCoy* court noted, "[a]lthough the Confrontation Clause does not guarantee 'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish,' it does require that a defendant be given 'an *opportunity* for effective cross-examination' of the witness." *Id*. at 15 (quoting *United States v. Owens*, 484 U.S. 554, 559 (1988)). A panel of this court has described the *McCoy* decision as emphasizing the "opportunity" for cross-examination as the "key element in describing a child witness who is available under the Confrontation Clause and the statute." *State v. McMillan*, No. E2020-00610-CCA-R3-CD, 2022 WL 855262, at *12 (Tenn. Crim. App. Mar. 23, 2022) (citing *McCoy*, 459 S.W.3d at 15).

The Defendant's argument—that he could not effectively cross-examine the victim because the forensic interview had not yet been admitted—misses the point; he had the opportunity to cross-examine the victim at trial. This is all the Confrontation Clause requires. Nothing prohibited the Defendant from impeaching the victim's trial testimony with any inconsistent statements that she had made during the forensic interview. *See* Tenn. R. Evid. 613; *see also State v. Austin*, No. W2014-01211-CCA-R3-CD, 2015 WL 2250464, at *10 (Tenn. Crim. App. May 12, 2015) (noting that where the forensic interview was introduced after the victim testified, "nothing prevented the [d]efendant from cross-examining the victim about the recording"). The trial court aptly noted this and added that it would have allowed such impeachment, if the Defendant had so chosen. We also note that the Defendant could have asked to recall the victim as a witness after the introduction of the forensic interview but did not do so.

The Defendant further argues, essentially, that cross-examination of the victim was not feasible due to either her lack of memory or her reluctance to testify on direct examination. We conclude this line of argument is waived. The Defendant did not attempt to cross-examine the victim in any manner following her direct examination, nor did he raise a confrontation objection at that time regarding the "quality" of her testimony. *See Franklin*, 585 S.W.3d at 455 (finding waiver of a confrontation claim where the victim was unwilling to discuss the details of the incident at trial, but the defendant did not raise a confrontation objection or request that the victim's testimony be stricken from the record); *see also* Tenn. R. App. P. 36(a) (stating that relief is not required for a party "who failed to

take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). As we have set forth above, and as the trial court noted, the victim *did* provide a number of pertinent facts during her direct examination. To accept the Defendant's argument would require us to speculate how the victim would have responded to his cross-examination, which we cannot do. In any event, the victim's reluctance to testify regarding the details of this incident on direct examination does not detract from the central point that the Defendant was given the opportunity to cross-examine her at trial in accordance with the requirements of the Confrontation Clause. The Defendant is not entitled to relief.

C.  The Victim's Competency to Testify

The Defendant argues that the victim "was incompetent to testify and thus unavailable for effective cross-examination." The State contends that the issue is waived because the Defendant did not challenge the victim's competency to testify at trial or in his motion for new trial. We agree with the State.

"Every person is presumed competent to be a witness except as otherwise provided in these rules or by statute." Tenn. R. Evid. 601. An Advisory Commission Comment to Rule 601 provides, "Virtually all witnesses may be permitted to testify: children, mentally incompetent persons, convicted felons." "Before testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so." Tenn. R. Evid. 603. A defendant can waive the issue of witness competency by failing to object to the competency of the witness, failing to move to strike the witness's testimony, failing to cross-examine the witness regarding competency, or by failing to move for a mistrial. *See State v. Rhoden*, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987), *writ of habeas corpus granted on other grounds*, *Rhoden v. Morgan*, 863 F. Supp. 612 (M.D. Tenn. Aug. 18, 1994).

The Defendant argues that the issue of the victim's competency as a witness has been preserved for appellate review because he "raised the issue of competence and felt that the [victim] was incapable of being effectively cross-examined due to either her inability or refusal to answer questions relevant to the case while she testified." The Defendant further argues that the issue of the victim's competence as a witness was "implicit" in his comments during the bench conference that occurred prior to Ms. Lewis' testimony. We disagree.

The record reflects that the trial court administered the oath to the victim prior to her testimony, in accordance with Tennessee Rule of Evidence 603. The Defendant lodged numerous objections during the victim's direct examination, but these objections pertained to the leading nature of the prosecutor's questions, not to the victim's competency to testify in the first instance. At the conclusion of the victim's direct examination, the Defendant did not seek to strike her testimony, to cross-examine her at that point regarding her competency, or to move for a mistrial. *See Rhoden*, 739 S.W.2d at 13. To the extent that the Defendant raised the issue of the victim's competency in the bench discussion prior to Ms. Lewis' testimony on the following day, such an objection was untimely. *See Bowman v. State*, 598 S.W.2d 809, 811 (Tenn. Crim. App. 1980) ("The law does not permit a litigant to remain silent during the testimony of an incompetent witness then later interpose an objection when the witness's testimony is determined to be unfavorable."). A defendant "should object to an incompetent witness's testifying when the witness is first offered." *Id*. (citing *McCormick v. State*, 186 S.W. 95, 96 (Tenn. 1916)). Furthermore, the Defendant did not raise the victim's competency as an issue in his motion for new trial, also resulting in waiver. *See* Tenn. R. App. P. 3(e); *State v. Grady*, 619 S.W.2d 141, 143 (Tenn. Crim. App. 1980) (finding waiver in a child sexual abuse case where the issue of a child-witness's competency was not included in the motion for new trial). The Defendant is not entitled to relief.

### III.    CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
KYLE A. HIXSON, JUDGE